will hear the first case, United States v. Linick, Kaplan, Dumas, Goldberg, and Rea. May it please the court, my name is Randall Unger and I represent Mr. Linick on this case. I'd like to confine my argument to two of the issues raised in the brief, the legal insufficiency of the evidence and ineffective assistance of the evidence. I would point out there were stark differences between the cooperator's account of what Mr. Linick said to his customers and what the customers actually testified to. The cooperating witnesses claimed that everyone in the company, Venstar, made fraudulent promises to the customers, essentially lumping Mr. Linick together with the other salesmen, including the cooperators themselves, who probably made the most outrageous misstatements to Mr. Linick's actual customers, who testified in this case, testified that Mr. Linick did not guarantee any particular profits. He provided them only with estimates of what they could earn from the business, and he made it clear that the business, like any other, carried risks. Well, there certainly was testimony to that effect, but there was testimony by other people, the jury. So I don't know how you can say that there is insufficient evidence a jury could find. The more interesting argument has to be the sufficiency of counsel  . Good morning, Justices. May it please the Court, my name is Vincent Martinelli, and as you heard earlier, I represent Lawrence Kaplan. I also would like to confine my arguments to basically a singular issue of the loss amount enhancement imposed on all of the defendants, obviously Mr. Kaplan, and argue to the Court that the loss amount enhancement . . . Was that not resolved in Weaver? It was to a certain degree in a summary opinion, not fully briefed by the Court. I would just like to expand on it briefly here with respect to . . . I guess the main question I had coming here today was a question that that panel, because I was here for that panel, that that panel opposed to government counsel. And the question that the panel imposed to government counsel that day regarding restitution was, is there an anomaly between restitution being almost demanded, not almost, being demanded in a criminal case and precluded in a civil case, whereas the victim essentially cannot recover in a civil case and can recover in a criminal case, and the Court opined and questioned, was that an anomaly? And I think what the Court was driving at, by asking the government that question, was a sentence not just contains a jail component or a punishment component, it also contains a restitution component. The restitution amount here is well over $6 million, joint and several, between Larry Kaplan and his lead defendant, Ned Weaver. Yet none of that restitution would have been available in a civil case. I think . . . Isn't that because of a statutory scheme? Isn't there a statute? There is, but what I . . . Doesn't that explain the so-called anomaly or difference? Well, I think what the judges were hinting at, if I could surmise my opinion, is that these loss amounts, which are a wholly separate issue than restitution, they, in essence, drive the guidelines. Well, they may do so, but after that Court in Weaver asked that question and so was puzzling about some of the issues that you are raising, they then held it was okay. So, you know, they did hold that after puzzling with it, and we are bound by their holding. And what the Weaver Court relied on was United States v. Binday, and I think rightfully so. In that case, as what Judge Azraq did here, Judge Azraq, as in Binday, said, regardless of what the loss amount is, I'm sentencing the old-fashioned way. Are you asking us to revisit Weaver? I am not asking you to revisit Weaver in any way. I'm just saying that there's a distinction between Binday, which I don't think was adequately fleshed out in the last panel, and I was trying to do that here. And, again, I see I'm over time. I think that the— So you are asking us to revisit Weaver? I am not. I was just asking to clear up the differences between what Weaver's court may have said with reference to loss amount, and what I see the difference here is with Mr. Kaplan. Thank you. Thank you. May it please the Court. Again, I'm Peter Tomeo on behalf of Mr. Dumas. Getting to this intended loss issue, in Mr. Dumas' case, he's in a different position than Mr. Weaver, and I would say that the Weaver case is not controlling his situation, because the loss in Weaver's case was based on the entire operation of the company, whereas the loss—the parties agreed that the loss for Mr. Dumas should be based upon what his customers lost or didn't lose. And the government started out claiming that there was a loss in excess of $2,300,000. The restitution amount, the actual loss, was set at $290,000, $2 million less. The minimum was $250,000, right? That's for the guidelines. Right. Yes. So just above the guideline level, but the— That's not much of a difference. Well, this affected two levels, because you're looking at the bottom of the $290,000 guideline level. We're talking about she found that the loss, Judge Azraq found that the loss was $1.4 million, was the intended loss. And that was based on really nothing. Those numbers pulled out of thin air. The court only has to make a reasonable estimate of the actual loss. Exactly, but that wasn't reasonable. Reasonable has to be based upon reason. Here, what the judge said is that, and the government argued, is that Mr. Dumas, for the entire time of this period under the indictment, 2004 to 2009, intended that every single customer lose every single dollar. And that just simply wasn't true. What's important— Well, what he said about what he did does not make a conclusion of that sort absurd. It may not be necessary, but does it make it absurd? But it does, Your Honor, because of the timing. What happens here is that the government conflates everything that occurred over the five-year period for every single individual, and it attributes knowledge to every single person. The clients that Mr. Dumas had who testified in court, there were five of them. There were four of them that he dealt personally with. There were four of them—I'm sorry, three of those were purchased in 2007, one of them purchased in 2004. It wasn't until later in 2009 that some of these individuals had started having problems, the locating companies. One of the things they conflate is this idea that one of the customers, he referred a locating company called Vending Dreams, and the government said, ah-ha-ha, he called it Vending Nightmares. But the government ignores the fact that that title, that slur, didn't come up until a year after Mr. Dumas made the recommendation of that company. And could not have been something he had in mind at the time. It's only by conflating all of those things together that the government comes up with this theory of liability and of damages. And the law is clear that to be fortunate, the statement has to be fortunate at the time it's made. The fact that at some later time a locating company becomes deficient doesn't mean that Mr. Dumas knew that and had to know it at the time. And the government attributes that kind of knowledge to him. And they did that in the summation, too, the rebuttal summation, which was outrageously premeditated to suggest to the jury in so many words that Mr. Dumas had to be part of a conspiracy because these other cooperators testified they were part of a conspiracy, ignoring the entire involvement of Mr. Spinelli, who orchestrated the entire fraudulent scheme to his admission, in contradiction to what Mr. Dumas was doing at the time. Thank you. Thank you. Your Honor, Richard Goldberg was an entry-level salesman. The supervisors got kickbacks. His boss made hundreds of thousands of dollars. Richard was just a disposable employee. But the judge sentenced him as if he were the boss's right-hand man. The judge used the same script to sentence him as she did to sentence his boss. That was error. You say, as I understand it, that your client's statements to James Jackson were acceptable sales puffery, right? But when you look at what Jackson testified as to what Goldberg said, it doesn't seem just mere puffery. He says that the Venstar machines were made of high-grade plastic that was the same plastic as of the space shuttle, right? That seems like puffery to me. But, Your Honor, I think the point of Mr. Jackson's testimony is that it showed that Mr. Goldberg's pitch was different. He was not just like the others and shouldn't have been sentenced in the exact same way as the others. Isn't this all something that the district court there watching these people, hearing the testimony, is in a best position to decide? I mean, you tell us that he was different. You tell us that this was puffery. All of this is the kind of thing that the sense of the district court is going to tell us. I mean, how do we sitting here tell the difference? Well, you can tell from the facts. And you can tell that the judge didn't consider these differences at sentencing because the judge used the exact same words to sentence Mr. Weber, Mr. Goldberg's boss. You're not making it. This is not a liability argument. It's really a sentencing argument. It is a sentencing argument. Mr. Goldberg was not sentenced as an individual. And the sentence didn't take into account his lesser culpability than others or his different background. Mr. Goldberg had a very difficult childhood. He was an unemployed high school graduate when he started at Ben Star. He worked there much less time than many of the others. He made significantly less money. He was not the same as the other defendants and should have been treated as an individual. That's what our law requires. Thank you. Thank you. May it please the court, the convictions and the sentences in this case should be affirmed. Regarding the sufficiency of the evidence arguments, all of those were arguments that were made repeatedly throughout the trial, that were made repeatedly throughout the summation. They were arguments that the jury heard and that the jury answered in its guilty verdict, a verdict that was amply supported by the evidence and that was entirely rational. Regarding the ineffective assistance claim of Mr. Linick, after trial Mr. Linick was appointed new counsel who handled post-trial briefing and as well as this appeal. Judge Azraq held an evidentiary hearing on the ineffective assistance claim at which both Mr. Linick and his trial counsel testified at length. Based on that hearing, based on the assessment of the credibility of those two witnesses, and based on the evidence she heard while presiding over the trial for six weeks, Judge Azraq found that trial counsel was not ineffective. There's really nothing more that we need by way of a record to decide the ineffective assistance of counsel claim. You would agree with your adversary? I agree with that, Your Honor. What about the concern raised by your adversaries that each of the salespeople got the same sentence, that the language used by the district judge was virtually identical as to each person? Raising a question in your adversary's mind as to whether the district judge really took into account the individualized circumstances of the salespeople involved. For example, Linick being, we are led to believe in ill health and older. Yes, Your Honor. So, first of all, at the sentencing, at each of the defendant's sentencings, the district court went through the process that this court has prescribed. She reasonably calculated the advisory guidelines. She addressed the 3553 factors, and as part of addressing the 3553 factors, she discussed each defendant's age, each defendant's role, each defendant's characteristics. The letters that she had received from family and friends. Regarding the language used, each of these defendants was convicted of the same conspiracy and of the same scheme to commit mail fraud and wire fraud. But did she say, did she explain why she was giving the same sentence to each of these people, despite the fact that there were differences which she had noted earlier? And do we require that? This court requires the district court to explain to some degree the rationale for the sentence imposed, and the record indicates that the district court did so in this case. One of the 3553 factors is the need to avoid unwarranted sentencing disparities. In this case, Mr. Rhea, Linick, Goldberg were all salesmen. They were all at the fraudulent operation for roughly the same period of time. They were all responsible . . . But there were differences. Some of the people said of Linick that he was a straight shooter much more than were said of some of the others. There were differences of age. And I'm just interested in whether the court, after, you know, you can go through the things completely without saying, I'm doing this, this, and this, but without giving any real sense that you know, that you've seen the possible differences and why you ignore them. And I just wonder whether a court should be required to do that. I believe a court is required to do that, and I believe the district court did so in this case. And at each of the sentencing hearings, yes, the judge did use similar language in describing the crime, the same crime of which each defendant was convicted, but she also used distinct language in addressing each defendant. And the sentences here, they're not all the same. Mr. Dumas received a 48-month sentence. That is in recognition of his role as a manager. Mr. Kaplan and Mr. Weaver's sentences were significantly higher than the salesman's. So the district court clearly was weighing each defendant's role in the scheme. Mr. Linick did not argue age at sentencing in particular and age in itself. The government would contend is not a reason in and of itself for one defendant to receive a more lenient sentence than another. Haven't we said that even intra-case disparities in a multi-defendant case are not the types of disparities that we're talking about or that 3553 is referring to? That's a nationwide disparity that is a real concern? I think there's case law saying both, that judges should avoid unwarranted disparities intra-case. In that hearing on the effectiveness of counsel, was the question of whether age should have been raised and discussed? Your Honor, I do not believe it was raised in the ineffective assistance of counsel context. Is that enough to say that we should put that off? Should Mr. Linick choose to use his one shot at habeas? I mean, I don't know that we do defendants a favor when we put off the ineffectiveness of counsel 22255 because it does mean that if they're going to raise it, they have to use their one habeas shot at it. But does that mean that we should give them a chance to raise that issue there? No, Your Honor. If Mr. Linick's counsel wished to raise age as an issue, they could have raised it. So age was certainly not an issue. It was not a defense on criminal liability. It was not a trial counsel issue. And once the trial ended, trial counsel was replaced. Oh, I see here. Mr. Linick's new counsel, right? He had new counsel. Yes, and they have not raised that. Sorry. That also goes to the issue you raised earlier, Judge, as to I think an argument basically that it's ineffective assistance per se for trial counsel not to have attempted to find supposed satisfied customers of Mr. Linick. What the record shows is that trial counsel did not believe that evidence from satisfied customers, if it existed, would be helpful. That's actually borne out by the record. Other defendants called several satisfied customers. The trial judge did not find their testimony credible. The jury obviously returned the verdict that it did. It's also important to distinguish, I think there's been some conflation between the time trial counsel spent with his client before trial versus the amount of time he spent preparing for trial. The record indicates that counsel said he spent many hours preparing for trial going through discovery. That's on page 141 of Mr. Linick's appendix. And regarding satisfied customers, there's no evidence that there were any satisfied customers. And that is something, if there were evidence that there were satisfied customers, Mr. Linick's post-trial counsel have had three years to find such satisfied customers. Weren't there some customers who testified that they were satisfied? There were several customers, none of whom dealt with any of these defendants, none of whom dealt with Mr. Linick specifically. You actually meant to make a somewhat narrower statement. Correct. I think their complaint is that Mr. Linick's trial counsel did not attempt to find any satisfied customers of Mr. Linick. And I would submit that trial counsel cannot pull witnesses out of the ether. There's no evidence that there were any such customers. And ironically, the fact that Mr. Linick was unable to point his trial counsel to any customers underlies that when he was telling prospective customers of Venstar that there were all these happy, satisfied customers was a misrepresentation. On Goldberg's wire fraud conviction, you've got Jackson who testifies that Goldberg told him that he would get his investment back, and I'm quoting, if he emptied his machines once. And that's technically true, isn't it? The record is, I don't think that's technically true. I think if you interpret all inferences in the light most favorable to the government, the trial record was even if that were to happen, that would not have been true. But in addition to that, other misrepresentations that Mr. Goldberg made to Mr. Jackson were that Mr. Goldberg would hold his hand every step of the way, that Mr. Goldberg owned machines himself, that, as you already mentioned, that the plastic on the machines was the same type of plastic in the space shuttle, that Venstar offered lifetime insurance, and Mr. Goldberg directed Mr. Jackson to a locating company that he knew would not provide the services that he was touting it would provide. Your Honors, unless there are any further questions, the government respectfully requests that the convictions and sentences be affirmed. Thank you. We'll hear some rebuttal. Mr. Martinelli? Yes, Judge, thank you. You have one minute, then Mr. Tameo has one minute, and then Ms. Glaushauser has one minute. Your Honor, unfortunately for myself, I think Mr. Tameo did a better job of addressing the sufficiency of the loss amount issue a little bit better than I, in that I stumbled a little bit on the differences between essentially what Ned Weaver's $6 million judgment amount is, and what Myrie Kaplan's $6 million amount is, joint and several. The government certainly argued at trial that Kaplan was Weaver's right-hand man, but I think additionally, it could be said that Mr. Weaver made no sales at all, made zero sales. So the question of how do you determine what the loss amount is for Mr. Kaplan is significantly more difficult than it is for any other individual. He's not management, he's not Ned Weaver, he's not setting policy. Maybe he's passing along the policy that Ned Weaver dictates. And he made zero sales, zero. In the entire time he was at Vennstar during this indictment period. In addition, what adds to the confusion is that three witnesses did testify for the defense that they were happy to the tune of $20,000 profit. One said $20,000 total, another said $20,000 per year that he earned. And so the question becomes when Judge Azraq issues a 60% credit let's say. Where does that number come from? How is that determined? There was no evidence at trial for her to rely on, zero. How come it wasn't 65%, how come it wasn't 55%? And I think that's a faulty analysis that would lead to a re-sentencing. Thank you. Thank you. I want to be mindful of the limits of rebuttal to responding to what was said. And I only note when Mr. Jasper did mention that Mr. Dumas had a 48 month sentence because of his role in the offense. That we did argue in our briefs and brief extensively on the fact there wasn't a basis for that distinction and those additional points. The other- Three level enhancement. The three level enhancement because it was based upon testimony. Again, conflating what happened after the events. We've got your argument on that. But I think that, thank you. So I don't want to spend any time on that. But I do want to say that there was one point that Mr. Jaspers mentioned and he said, look, the sufficiency of the evidence is okay because all these arguments were made and the jury voted to convict them. Well, that isn't how sufficiency of the evidence is determined. It does determine what the inferences are and it is very important. But it doesn't cure the error of Mr. Jaspers' rebuttal summation of the making what Justice Jackson so many years ago called the birds of the feather argument. All these people must be guilty because the cooperators testified they were guilty. And that's precisely what Mr. Jaspers said. And beyond that, we'll rest upon our arguments. Thank you, Your Honor. Thank you. Your Honors, Mr. Goldberg was different. And the government's answers to your questions ignored some of those differences. The locating company that he recommended to Mr. Jackson, first of all, he gave Mr. Jackson choices. And then the one that he recommended is not the one that the government presented evidence about at trial. There wasn't evidence Mr. Goldberg didn't own his machines. And Your Honor's questions about sentencing, they focused on Mr. Linick being the oldest. Mr. Goldberg was the youngest and he was the least experienced. He was one with no business sophistication. He wasn't, and at sentencing, he presented a number of facts about his change. Making just a substantive reasonableness argument? No, Your Honor. Making a procedural reason. Yes. I'm. What is the exact error? The failure to consider him as an individual. The plugging in of facts to a script that was used for other people that were different, just because everyone is different, but also more culpable. A judge is supposed to. So the error is not a guidelines calculation error. I raised one in my brief, but the error that I'm focusing. The one that you're focused on now. That's correct, Your Honor. And so it's a purely a 3553 argument. The rest on the court's alleged failure to say that, or refer to his lack of experience, to what? It's, it's the judge's failure to consider him as an individual by. I'm trying to figure out what the procedural flaw is. Is the flaw that the judge didn't say A, B, C, or D? Because that, if it is required, and I don't know it is required, would be a procedural error, or is the flaw that he, the judge, in fact, did not consider these things substantively, and therefore came out with a wrong answer, in which case it is a substantive argument, not a procedural one, and I'm not clear which of these two you're making. I think some of the confusion is that I am making both, but the procedural. Okay. I'm sorry. That's helpful to know. The procedural error, though, is because the judge used a sentencing script. For Mr. Goldberg and for Mr. Weaver. She used the same exact language. And that fails in the judge's procedural duty to consider each. What, what case or cases do you have on the question of sentencing that tells us that it is procedurally wrong for a judge to use the same script? Your Honor, I don't have a precise case because I don't think it really happens. Judges don't read the same script for different defendants. 3553A makes clear. Unfortunately, I've seen quite a few cases in which that has happened. There was one recent fervoring of prostitution case in which the judge used exactly the same script in, used the same language. So, I don't, you know, I don't know. So, I would hope your honors would find that was also procedurally unreasonable. You're asking us to be, I think you just acknowledged that there is no case law, at least from our circuit, that has determined that that's procedurally unreasonable, but you're asking us for a, and I'm just trying to understand what you're saying. I understand, Your Honor. Because I'm having trouble. You're asking for an opinion, effectively, that says that if a district court judge reads the same case at sentencing, that is procedurally unreasonable. Your Honor's have . . . Is that, is that right? Yes, but I don't think it's as different as your Honor is presenting it. It might well be something which one could consider saying that judges should do. Against that is, you know, how much do you press a judge's time? We've got any number of opinions in which we say, basically, you look, you know, assume the judge is doing things right, you know. But it is an argument, so we'll hear it. I don't think it's as different as the case law already, that already exists, because the case law is clear that a person must be considered as an individual at sentencing.  If you had two people who were, had the same characteristics, right, convicted of the same crime, you wouldn't say that there was error, would you, if the script were the same? It's hard for me to imagine two people that had the exact same characteristics and had no differences between them in culpability or background. But if there were clones of each other who had done exactly the same thing, then no, your Honor. But your Honor's presenting a counterfactual here, and that's why this is a substantive unreasonableness argument as well. Mr. Goldberg was different. This isn't just a procedural error, it's also an error in the court failing to take into account Mr. Goldberg as a whole and see that three years was too long for him to be sentenced. Thank you. Thank you all for your arguments. The court will reserve decision.